IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DENNIS CLARK JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 16-cv-177-SMY-RJD |
| | ) |
| WEXFORD HEALTHCARE SERVICES INC., et al., | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Dennis Clark, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated while he was incarcerated at Lawrence Correctional Center ("Lawrence"). Specifically, Plaintiff alleges that Defendants were deliberately indifferent to his hypokalemia. Following screening, Plaintiff proceeds on his claim that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment (Doc. 8).

This matter is currently before the Court on Defendants' Motion for Summary Judgment (Doc. 60). Plaintiff filed a Response to Defendants' Joint Statement of Undisputed Facts (Doc. 81) and Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Doc. 80); Defendants filed a Reply (Doc. 82). For the following reasons, Defendants' motion is **GRANTED**.

## Factual Background

The following facts have been taken from Plaintiff's deposition, with supplemental information from Plaintiff's medical records where noted. On or about June 26, 2015, Plaintiff Dennis Clark arrived at Lawrence from Stateville Correctional Center (Doc. 61-2 at 7). At the

time he arrived at Lawrence, Clark was taking a potassium supplement (KTabs), 40 milliequivalents, twice per day (Id. at 7-8). Clark had been hospitalized due to symptoms of hypokalemia (low potassium) multiple times (Id. at 4).

Dr. Coe ordered the same dosage of potassium supplement for Clark upon his arrival at Lawrence which he received on June 27, 2015 (Id. at 8). On July 23, 2015, Clark was seen by Physician Assistant James and self-reported his history of hypokalemia; James referred him to see a nephrologist via telemedicine (Id. at 8-9). Clark had a telemedicine visit with the nephrologist on August 6, 2015 – she made no change to his dose of supplemental potassium (he remained on a dose of 40 meq twice per day) (Id., Doc. 61-1 at 8).

On August 17, 2015, Clark was examined by Dr. Coe for chest pain at which time he informed Dr. Coe of his history of low potassium since age 11 (Doc. 62-2 at 12, Doc. 61-1 at 12). Clark also reported that he was able to participate in athletic activities such as basketball without problems (Id.). Dr. Coe ordered an EKG which was conducted on August 21, 2015 (Doc. 61-1 at 13).

Eight days later, Clark was seen by a physician assistant who enrolled him in the General Medicine Clinic to be seen every six months to monitor his history of low potassium syndrome, and ordered lab testing to be done in October 2015 (prior to the next clinic date) (Id.). Clark had no symptoms of low potassium during his time at Stateville or Lawrence prior to September 28, 2015 (Doc. 61-2 at 15).

At approximately 12:48 a.m. on September 28, 2015, Clark woke up and could not move (Id. at 15-16). He called out for his cellmate, Corey Lee, and asked him to press the emergency button because his potassium was low and he could not get out of bed (Id. at 15-16). Lee lifted him out of the top bunk, brought him to the bottom bunk and put his head over the toilet so that he could vomit (Id. at 16). Lee then pressed the emergency button and C/O Buchannan

responded (Id.). Lee told Buchannan that Clark needed medical attention and Buchannan said he would call the nurse (Id.). Buchannan came back to the cell approximately 15 minutes later and said the nurse would be over when she got a chance (Id.). Clark continued to vomit while he was waiting on the nurse (Id.). He felt pressure on his spine and was getting stiff from being slumped over vomiting (Id. at 17).

Nurse Powell and Kevin Blevins arrived at Clark's cell to find him slumped over in his cellmate's bed vomiting (Id.). Powell asked Clark what he had eaten recently (Id.). He told her that he knew what was wrong with him…that his potassium was low because he had episodes like this before (Id.). Powell told the C/O to put Clark in a wheelchair and take him to HCU to take his vitals (Id.). Clark requested to be sent to an outside hospital because he could not move and his vision was going in and out (Id. at 18). Powell told him it was likely that he had eaten something that had made him sick (Id.). Clark alleges that Powell repeatedly cursed at him while she was assessing him (Id.).

When Clark was in the HCU, Powell took his vitals and called Dr. Coe (Id.). Powell told Clark that Coe's order was just to see what was wrong with him (Id., Doc. 61-1 at 18). He asked Powell to call Dr. Coe a second time and explain to him that he was vomiting, that he could not breathe, and that heart was not beating right (Doc. 61-2 at 18). Clark heard Powell call Dr. Coe back, but she did not explain any of his symptoms and did not relay any information regarding Clark's condition worsening (Id.). Powell then told Clark he would be seen by Dr. Coe in the morning and that he was to be escorted back to his cell in the meantime (Id.). The C/Os transferred Clark back to his cell and put him back on the bottom bunk (Id. at 19).

Clark continued to vomit and after approximately an hour, his cellmate pressed the emergency button again (Id.). Powell was called back to the cell and had the C/Os put Clark a wheelchair and transfer him to HCU (Id. at 20). Powell again called Dr. Coe when Clark arrived

back in HCU (Id.). The medical records indicate that an EKG was performed and the results were read to Dr. Coe over the phone. However, Clark disputes that an EKG was conducted at that time (Id. at 23). After speaking to Dr. Coe over the phone, Powell asked the C/O to see if a bed was available in the infirmary (Id. at 20). The C/O checked the infirmary and reported back that there was no bed available (Id.).

Clark alleges he was then transferred back to his cell (Id.). The medical records indicate that Clark was transferred to HCU just twice that night, but Clark recalls being transferred three times (Id. at 23). According to the RN Note, after the second transfer to the HCU, Dr. Coe ordered that Clark be held in the HCU until he was seen by him that day (Doc. 61-1 at 20).

Approximately 30-40 minutes after being back in his cell, Clark was still vomiting, so the C/O and nurse were called back to his cell a third time (Id. at 21). He was again transferred to HCU and was placed in a Geri-chair in the HCU bullpen until the doctor arrived (Id. at 22-23). Powell put a pail on the floor for him to vomit in (Id. at 22). She could visualize Clark in the bullpen while sitting at her desk (Id. at 23).

Dr. Coe arrived at approximately 8:00 a.m. on September 28, 2015 (Id.). A room was cleared out in the infirmary and he was moved there sometime between 9:00 a.m. and 10:00 a.m. (Id.). Dr. Coe ordered labs, and Clark recalls having his blood drawn and urine taken (Id.). Dr. Coe also ordered IV fluids for dehydration and Clark was given pills for the nausea (Id. at 24).

When the lab results came back, Dr. Coe reviewed them and told Clark his potassium was so low he needed to be admitted to the hospital (Id. at 25). At approximately 12:00 p.m., Clark was transported to Lawrence County Memorial Hospital where he was treated for low potassium (Id.). When Clark returned to Lawrence from the hospital, he was placed back in his cell, not the infirmary (Id. at 26).

On October 6, 2015, Clark was seen by Dr. Coe. He was ordered by the nurse to bring his potassium pills with him to ensure he was taking them (Id. at 27). Clark was admitted to the hospital two more times following the September 28, 2015 admission. Eventually, Lawrence County Memorial Hospital transferred him to Carle Hospital in Champaign, where he was diagnosed with Bartter's Syndrome (Id. at 28).

## Discussion

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). When deciding a summary judgment motion, the district Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). The Eighth Amendment protects inmates from cruel and unusual punishment. U.S. Const., amend. VIII; *see also Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010). "[D]eliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, the plaintiff must first show that his condition was "objectively, sufficiently

serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted). Negligence, gross negligence, or even recklessness are not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653.

"[M]ere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer "verifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of harm. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007).

**Defendant Tammy Powell, RN**

Defendant Powell asserts that she was not deliberately indifferent to Clark's health and safety on the night of September 28, 2015. Specifically, she points out that when she was called to treat Clark, she assessed him, obtained his vital signs, notified Dr. Coe of his condition and followed through with Dr. Coe's instructions. She maintains that his vital signs were stable and there was no indication that his condition necessitated an emergency transfer to the local hospital during the night. For his part, Clark argues he told Powell about his history of hypokalemia and that she should have taken a blood sample sooner in order to determine his potassium levels. He

also claims that despite his continued vomiting and complaints of paralysis, Powell did nothing to treat either condition.

Clark's assertion that Powell did nothing to treat his condition is not supported by the record. Powell responded to his emergency call at least twice, and ordered him transferred to the HCU each time. Indeed, Clark acknowledges that Powell took his vital signs and called Dr. Coe to report on his condition multiple times in the early hours of the morning. While Clark alleges Powell did not relay the severity of his condition, he does not dispute that she provided Dr. Coe with his accurate vital signs. After speaking to Dr. Coe, Powell placed Clark on the list to be seen by the doctor when he arrived. When Clark's complaints continued and he was transferred back to the HCU, Powell positioned him where she could observe his condition until the doctor arrived.

Clark disagrees with the tests that were conducted overnight and the information that was relayed to Dr. Coe. But mere disagreement with the course medical treatment does not constitute an Eighth Amendment claim of deliberate indifference. Moreover, Clark acknowledges that Dr. Coe gave Powell no orders to treat his vomiting or paralysis, or to determine Clark's potassium levels.

The primary basis for Clark's criticism of Powell's conduct appears to be that she was callous, continually cursed at him and chastised him for complaining. Although being rude while treating a patient may be unprofessional, it alone cannot support a claim for deliberate indifference. Thus, Defendant Powell is entitled to summary judgment.

### Defendant John Coe, M.D.

Defendant Coe asserts that he is entitled to summary judgment because when he arrived at Lawrence on September 28, 2015, he assessed Clark and ordered lab tests, IV fluids, and anti-

nausea medication.  Further, after receiving Clark's lab values and learning of his low potassium, he ordered that Clark be transferred to Lawrence County Memorial Hospital.

Clark argues that Dr. Coe was aware of his history of hypokalemia and that the only way to determine his potassium levels was to order a blood sample; therefore, Dr. Coe should have ordered a blood sample much earlier when he was first contacted by Nurse Powell.  Clark also maintains that Dr. Coe was deliberately indifferent because despite the fact that Powell contacted him multiple times during the night, he never ordered any treatment for Clark's ongoing vomiting or paralysis.

Clark's claim against Dr. Coe is not that he was denied treatment, but that treatment was unnecessarily delayed.  In cases in which inmates allege a delay in treatment rather than a denial of medical assistance, the plaintiff must produce verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm.  Here, Clark argues that because of the delay in ordering a blood test to check his potassium levels, he suffered additional hours of vomiting and paralysis.  However, he has produced no medical evidence that the six-hour delay of the blood test caused harm.[1]

Even if Clark had provided medical evidence of distinct harm from resulting from the delay, Clark's own testimony undercuts his argument that Dr. Coe knew the seriousness of his condition overnight – he testified that Nurse Powell was not accurately relaying the severity of his symptoms to Dr. Coe.  It is possible that Clark could show that given his history, not ordering a blood test immediately was negligence, or even gross negligence, but that is not enough to show deliberate indifference.  Dr. Coe's orders overnight and when he arrived at Lawrence were not so plainly inappropriate as to permit the inference that he intentionally or recklessly disregarded Clark's needs.  Accordingly, Defendant Coe is entitled to summary judgment.

---

[1] Plaintiff's attorney made an eleventh hour attempt to re-open discovery to obtain expert medical testimony and was denied because Plaintiff had already been granted multiple extensions of time to complete discovery and to file a Response to the Motion for Summary Judgment.

## Conclusion

Defendants' Motion for Summary Judgment (Doc. 60) is **GRANTED**; Plaintiff's claims against Defendants Powell and Coe are **DISMISSED WITH PREJUDICE**. As Plaintiff previously filed a Stipulation of Dismissal with Prejudice (Doc. 73) as to the remaining defendants, the Clerk of Court is **DIRECTED** to enter judgment accordingly and to close the case.

**IT IS SO ORDERED.**

**DATED:  March 27, 2018**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**